**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MITCHELL HIGASHI, | |
| Plaintiff, | CIVIL ACTION NO: |
| v. | |
| GENEDX HOLDINGS CORP., | MAY 2, 2024 |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

The Plaintiff, Mitchell Higashi (hereinafter, "Plaintiff"), by and through the undersigned counsel, Carey & Associates, P.C., files this Complaint against the Defendant, GeneDx Holdings Corp. (hereinafter, "Defendant GeneDx" or "Defendant"). Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1.  Plaintiff's Complaint asserts claims for: (1) fraudulent misrepresentation and inducement; (2) negligent misrepresentation; (3) discrimination based on age in violation of Age Discrimination in Employment Act (hereinafter, "ADEA"); (4) discrimination based on age in violation of New York State Human Rights Law, N.Y. Exec. Law § 296; (5) discrimination based on age in violation of New York City Human Rights Law § 8-107; (6) discrimination based on age in violation of Pennsylvania Human Relations Act (hereinafter, "PHRA"), Pa. Stat. Ann. tit. 43, §§ 951, *et seq.*; (7) discrimination based on age in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §46a-60(a) (hereinafter, "CFEPA"); (8) discrimination based on race pursuant to 42 U.S.C. § 1981; (9) discrimination based on race in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1) (hereinafter, "Title VII"); (10) discrimination

based on race in violation of New York State Human Rights Law, N.Y. Exec. Law § 296;
(11) discrimination based on race in violation of New York City Human Rights Law § 8-
107; (12) discrimination based on race in violation of PHRA; (13) discrimination based
on race in violation of CFEPA; and (14) intentional infliction of emotional distress.

## PARTIES

2.    Plaintiff, Mitchell Higashi, is a resident of the State of Pennsylvania. Plaintiff worked for
      the Defendant in Pennsylvania, New York City and Connecticut. Plaintiff had daily
      contacts and contacts multiple times a day with Defendant offices, including Defendant's
      New York City office, via various communications and Zoom meetings and team
      members, attended in person meetings based out of the New York City office.  In today's
      new age of remote work, Plaintiff worked remotely in the New York City office and
      Connecticut offices from his home in Pennsylvania. Plaintiff experienced ongoing and
      continuous discrimination during the aforementioned time period at all of Defendants
      office locations.

3.    Defendant GeneDx is a Delaware registered company with its principal place of business
      located at 333 Ludlow Street, North Tower, 6th Floor, Stamford, Connecticut 06902.
      Defendant also maintains corporate offices in New York City located at PENN 1, 1
      Pennsylvania Plaza, New York, NY 10119. At all times relevant to this Complaint,
      Defendant GeneDx conducted business within the jurisdiction of this Court.

## PROCEDURAL PREREQUISITES

4.    On December 5, 2023, Plaintiff filed a "dual charge" of discrimination against Defendant
      GeneDx with the Connecticut Commission on Human Rights and Opportunities
      (hereinafter, "CHRO"), New York City Commission on Human Rights (hereinafter,

"NYHRC"), New York State Division on Human Rights (hereinafter, "NYDHR"), Pennsylvania Human Relations Act (hereinafter, "PHRA"), and the United States Equal Employment Opportunity Commission (hereinafter, "EEOC").

5.   On February 12, 2024, the EEOC sent a Notice of Right to Sue letter regarding Charge No. 523-2024-00782 to the Plaintiff. **(Exhibit "A")**.

6.   On April 19, 2024, the CHRO sent a Release of Jurisdiction over CHRO No. 2420211. **(Exhibit "B")**.

7.   On February 21, 2024, the PHRA sent a Release of Jurisdiction over PHRA No. 2023 16272. **(Exhibit "C")**.

8.   Plaintiff exhausted all administrative remedies with respect to his claims concerning discrimination because of his age and race under both Federal, Connecticut and New York laws.

## JURISDICTION AND VENUE

9.   Plaintiff's claims pursuant to Title VII, 42 U.S.C. § 1981, and the ADEA raise questions of federal law.

10.  This Court has jurisdiction over the Title VII, 42 U.S.C. § 1981, and the ADEA claims pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's remaining claims, including those under the New York State Human Rights Law, N.Y. Exec. Law § 296; New York City Human Rights Law § 8-107, Pennsylvania Human Relations Act, Pa. Stat. Ann. tit. 43, §§ 951, *et seq.*, and Connecticut Fair Employment Practices Act § 46a-60, *et seq.*, which arise from the same case or controversy, pursuant to 28 U.S.C. § 1367(a).

11.  The District of Connecticut is the appropriate venue for this matter pursuant to 28 U.S.C.

§§ 1391(b)(1) and (2), as the unlawful conduct complained of herein took place within the District of Connecticut.

## FACTUAL ALLEGATIONS

1. Plaintiff is an Asian male of Japanese ethnicity, he was 54 years old at the time of his termination, and his date of birth is XX XX, 1969.

2. Defendant is a patient-centered, health intelligence company, with a business address of 333 Ludlow Street, North Tower, 8th Floor, Stamford, CT, 06902. Sema4 became a publicly traded company on July 22, 2021. On January 9, 2023, Sema4 announced it changed its name from Sema4 Holdings Corp. ("Sema4" or the "Company") to GeneDx Holdings Corp ("GeneDx" or "Defendant"). However, Sema4 is still registered to do business with the State of Connecticut.

3. On October 11, 2021, Plaintiff began working at Sema4 as a Senior Vice President ("SVP") reporting to Dr. William Oh, Chief Medical Science Officer. Plaintiff started the position with a base salary of $390,000. Plaintiff's target annual performance bonus was 35% of base salary, which would be awarded based on Sema4 and individual performance metrics set forth by the Sema4 Board of Directors (the "Board"). The bonus was to be prorated for Plaintiff's first year of service.

4. However, Plaintiff's actual bonus after one year of service was $25,000 or 6.4% of base salary. Plaintiff was told that the Board had approved a bonus plan of ZERO for legacy Sema4 employees, but that legacy GeneDx employees would be eligible for their full target bonus.

5. The majority of Sema4 employees in the Research Department were Asian. Separately, Plaintiff's new manager, Gustavo Stolovitzky, Chief Science Officer, told Plaintiff that

4

he was fortunate to receive any bonus. The bonus structure was obviously not based on individual merit as several of the Sema4 employees that were retained after three rounds of layoffs were in critical business functions. On a Town Hall call with all employees in January of 2023, the new CEO from GeneDx, Katherine Stueland, said that "investors have great antipathy towards Sema4" and therefore, the company name and branding needed to be changed to GeneDx. Plaintiff therefore assumes the Board's decision to apply a differential bonus structure to the Sema4 versus GeneDx employees was intended to be punitive and not actually based on performance.

6.     As SVP, Plaintiff's job responsibilities at Sema4 were to define and implement innovative strategies that determine product value and commercialization activities for the Company's genomic solutions, algorithms, and pharma support program. Plaintiff was also responsible for ensuring alignment with commercial and market access strategies, including evidence generation (i.e., conduct research studies to produce results that can be legitimately disseminated to payers to justify Sema4's pricing and to request more favorable reimbursement).

7.     While Plaintiff was verbally offered a position at Sema4 in the June to July 2021 timeframe, the actual written offer was not extended until October 2021. Sema4's HR leader (Karen White) and Plaintiff's hiring manager (William Oh) attributed the delay to all of their efforts being devoted to the NASDAQ listing and follow-up work required for a publicly traded company. Plaintiff did correspond with the new manager to draft the role description, but Plaintiff did not officially start with Sema4 until October 11, 2021. Plaintiff was also required by Sema4 to sign a "SEMA4 PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT."

8.      Prior to joining Sema4/GeneDx, Plaintiff was a Vice President where Plaintiff's department generated evidence to support market access, medical strategy, and research in oncology, hematology, immunology, cardiovascular and rare diseases. While at his previous employer, Plaintiff was selected to present the pharma perspective on price-value assessments to Congress. Plaintiff has co-authored 20 peer-reviewed papers, including for JAMA. Plaintiff has served on the Board of Directors for the University of Washington Foundation.

9.      Plaintiff worked for his previous employer for the first ten months of 2021, but had to forego the entire year's target cash bonus for 2021 because Plaintiff did not work until the end of the year, December 31, 2021. When Sema4 finally extended a written offer to Plaintiff on September 15, 2021, Plaintiff was given a proposed start date of October 4, 2021. After finalizing terms, Plaintiff accepted the employment offer from Sema4 on September 21, 2021, with a start date of October 11, 2021. The previous employer's HR department changed their policy during 2021 to avoid paying prorated amounts for time served during a calendar year. Basically, an employee had to work the entire 12 months to receive their target bonus or get zero if time served during the calendar year was less than 12 months. Plaintiff did not work for previous employer until the end of the year because the offer from Sema4 had a time window in which Plaintiff was required to respond. Once they finally extended a written offer on September 15, 2021, Plaintiff was required to accept within a time window. Unfortunately, Plaintiff could not delay it until January 1, 2022.

10.     Per Plaintiff's September 15, 2021, employment agreement, Plaintiff's compensation package also included a Restricted Stock Unit ("RSU") agreement granting Plaintiff

rights to receive shares of the Company's common stock and an Options award agreement granting Plaintiff the right to purchase shares of the Company's common stock, at a price per share that reflected the fair market value of such shares on the date of grant. The total value of Plaintiff's RSU and Options Agreements was one million and six hundred thousand dollars ($1,600,000.00) on the date of the grant, divided equally between the two agreements. Each of these awards would be subject to a four-year vesting schedule, would be made pursuant to the equity incentive plan and award agreement approval by the Board.

11.    Per the employment agreement, Plaintiff was also eligible to participate in the Company's <u>annual</u> equity program once the Company has defined the equity program and such program has been approved by the Board. The Company targeted to award Plaintiff the equivalent of approximately $500,000 (five hundred thousand dollars) in value annually through this program, pursuant to the equity incentive plan and annual grant award agreement terms approved by the Board.

12.    However, Plaintiff's new annual RSU grant for 2023 was about $38,250 (6,060 shares, valued at $6.31/share as of June 2023, for a total award value (over 4 years) of about $38,250). This was a vast departure from the original $500,000 that was communicated in Plaintiff's offer letter. Therefore, Plaintiff lost the entire target bonus for 2021 from the previous employer, about $130,000. Plaintiff's former manager, Gustavo Stolovitzky, informed Plaintiff in March of 2023 that "times have changed" and "I tried my best" before delivering news of Plaintiff's new annual RSU grant of 6,060 shares, valued at the time at $6.31/share, for a total award value (over 4 years) of ~$38,250. As of December 1, 2023, GeneDx shares are now trading at $1.85/share.

13.    In addition, due to leaving his previous employer, Plaintiff lost about $800,000 in unvested RSUs that had already been granted, as well as a new equity grant that would have been granted in March to April of 2022, about $200,000 to $300,000. Each year, in the March to April timeframe, two material events happen for employees: (1) Previous stock equity grants will vest on a schedule of 20% annually over a five-year period; and (2) a new equity grant will be awarded. Plaintiff had already accumulated $862,000 in unvested RSUs, of which, $327,000 would have transferred over to Plaintiff's ownership in 2022. Recall that Plaintiff left his previous employer in October 2021. In addition, Plaintiff would have been awarded a new RSU grant of ($200,000 to $300,000) in March to April of 2022. This grant would vest annually, 20% per year over a five year period.

14.    When Plaintiff joined Sema4 in 2021, Plaintiff was repeatedly assured by Eric Schadt, the CEO & Founder, Isaac Ro, Chief Financial Officer, and William Oh, Chief Medical Officer that the company had been fully vetted by the SEC during the SPAC/IPO process.

15.    Plaintiff left a higher paying position with his previous employer to join Sema4 because the mission statement of Sema4 was compelling. They positioned themselves as being at the nexus of integrating genomic information with health systems electronic medical records ("EMR") for the purpose of advancing precision medicine (i.e., developing and delivering the right drugs to the right patients). Their major disease focus areas were Oncology and Women's Health. It appeared to be a role that Plaintiff was well suited for and could help to advance his career.

16.    The new mission set forth by GeneDx raised a banner and proudly proclaimed their mission to support rare diseases. The mission and strategy of GeneDx was very compelling. For example, rare disease moms face incredible obstacles: A newborn is

transferred immediately to the intensive care unit, unable to breathe, or her infant lacks

the strength to crawl or sit, or her child has a seizure. This mom will now embark on the

rare disease journey. On average, this journey will take four to five years, requiring ten to

twelve trips across the country to see various specialists, and cost tens of thousands of

dollars of personal savings. At this point, all of mom's sacrifices are simply to get an

accurate diagnosis. This is the diagnostic odyssey. GeneDx galvanized its employees,

including Plaintiff, to join them in their campaign to "End the Diagnostic Odyssey" and

elevate the common cause with rare disease moms. However, Plaintiff would discover

that GeneDx commits systematic fraud and exploits weaknesses in the billing and

payment system for rare disease genetic testing. All for the sole purpose of maximizing

revenue.

17.     Plaintiff was not aware that a fraudulent code stacking scheme had been in place at

Sema4 since 2018. Nor would this timeframe become apparent until twelve months later

(Case No.: 3:22-cv-01131-JBA, Helo V Sema4). On information and belief, the

Company was already engaged in fraudulent code stacking when Plaintiff interviewed

with the Company and when Plaintiff was hired. Had Plaintiff known about the

fraudulent code stacking business practices Plaintiff would have never left his prior

employment to join Sema4.

18.     Plaintiff's confidence in the Company was further bolstered by the August 2021 investor

call prior to joining the Company. Isaac Ro stated: "Volume growth is strong and we

remain confident in our long-term goal of delivering $500 million in 2023 revenue as we

partner with health systems, expand the menu of offerings, and scale the business." A

press release about the call stated: "Total revenue for the second quarter of 2021 was

$46.9 million, compared to $30.1 million in the second quarter of 2020. Revenue growth was driven primarily by an increase of volume in Women's Health and Oncology solutions, along with growth in collaboration service activities due to the execution of three new third-party contracts." However, they failed to disclose that they were in a payment dispute with a third-party payer, United Healthcare, during Plaintiff's interview and hiring process with the Company. Plaintiff would have never joined the Company had Plaintiff discovered this information and would have remained employed with his previous employer.

19.   During August to October of 2021, from Plaintiff's first introductory conversations with Eric Schadt and Isaac Ro, no statements or quotes related to the financial health of the ECS testing business were disclosed to Plaintiff. They did not inform Plaintiff that the ECS business was facing an imminent threat from a major payer requesting a refund of over $30 million due to inappropriate billing.

20.   However, shortly after joining the Company, through email correspondence, Plaintiff became aware on October 25, 2021 of a serious issue with a major payer, United Healthcare, regarding their concerns regarding the value of Expanded Carrier Screening ("ECS") testing, which constituted the majority of Sema4's revenue.

21.   ECS was a genetic test that Sema4 offered primarily to couples who were being seen by fertility experts for in vitro fertilization. The ECS test was performed on couples to identify their genetic risk factors and select embryos with a reduced risk of inherited genetic disease.

22.   On October 25th, 2021, Plaintiff was asked by his manager, Dr. William Oh to generate (i.e., develop research proposals, request budget, and produce research results) new

evidence to counter the United Health Care ("UHC") claim that Sema4 was over-charging for their primary product, Expanded Carrier Screening ("ECS"). Plaintiff did not suspect fraud at this time (October 25th, 2021). Plaintiff was given just enough background information from Eric such as "UHC is pushing back on the rates we charge for ECS testing" and "UHC says there is not enough evidence of value." The ECS situation was portrayed to Plaintiff as a legitimate need to produce new research results to counter a payer's position that they did not have enough evidence to evaluate the value of ECS testing. In a normal (i.e. compliant) healthcare business, payers may challenge manufacturers (e.g. pharma industry, commercial testing labs, diagnostic manufacturers) to produce rigorous research results to support industry claims of (1) good value for money; and (2) good outcomes results for patients.

23.   Plaintiff had no reason to suspect that the ECS product claims were fundamentally flawed, as evidenced by the following statement made by Eric Schadt on November 15, 2021: "The portfolio encompasses solutions for the diagnosis, prevention, treatment, and management of reproductive inheritable disease conditions for more holistic family care. To include a newly enhanced version of Sema4's expanded carrier screening for pregnancy planning, which includes the molecular ancestry component to more accurately assess high risk types derived from specific population groups, even at the specific level, to provide superior risk prediction . . . For those of you who don't know the IVF market, it is a highly concentrated market comprised of sophisticated and science-driven prescribing physicians. We're proud that the upgraded version of our ECS product is resonating well, and has allowed us to take market share in key national IVF accounts."

24.     On November 30th, 2021, Plaintiff needed background information from Eric Schadt, the CEO, in order to begin working on the project. However, Plaintiff found it odd that their manager, William Oh, the Chief Medical Officer, implied that it may be difficult to get the necessary background information from the CEO. William Oh said of Eric Schadt that, "He has been very reluctant" to share necessary information that Plaintiff was requesting in order to do the job. Plaintiff did not attempt to dig deeper to discover the true source of the subterfuge. Plaintiff assumed that it was (1) a highly confidential commercial dispute with a health insurance payer; (2) unnecessary information directly related to Plaintiff's job; and (3) could adversely impact Plaintiff's career.

25.     Plaintiff continued to search for background information related to the project. Plaintiff corresponded with Krish Gosh, a Senior VP, who had previously supported the ECS Business. Plaintiff's correspondence with Mr. Gosh consisted of emails and a brief meeting encounter where he joined a team call to review the spreadsheet. Mr. Gosh was now starting a new role at Sema4 as the Head of Biopharma Sales, so his purpose in joining this team call was to briefly review key areas in the spreadsheet where he thought that Sema4 could improve the Average Sales Price ("ASP") for the ECS test.

26.     On November 3, 2021, a spreadsheet was shared with Plaintiff that contained pricing and reimbursement information related to the ECS business and the health insurance payers who paid for Sema4's testing services. At the time, Plaintiff did not realize the significance of this spreadsheet. Plaintiff was simply looking for pricing information to use as an input for budget impact models that would be helpful for payers to understand the costs, patient outcomes, and downstream budget impact of ECS testing. Plaintiff was seeking one parameter from Finance and they inadvertently shared a spreadsheet that

<u>exposes a massive code-stacking scheme that they executed against all major commercial</u>
<u>payers, several State Medicaid programs, and investors.</u> This spreadsheet was sent to
Plaintiff from Krish Gosh, SVP Biopharma. This was the date that Plaintiff obtained
evidence of the code stacking fraud and how far back it went. Plaintiff did not fully
realize it at the time that this was code stacking fraud. Plaintiff only suspected that
something was fundamentally wrong with the business. Plaintiff did not fully connect all
the dots regarding the code stacking scheme until April 20, 2023, when Jason Vellen
called the billing tactics "illegal." The Company never informed Plaintiff that they would
be working on this code stacking fraud and Plaintiff absolutely would have never joined
the Company had the Company been honest about the fundamentals of their business.
Plaintiff would have remained employed with his previous employer and continued to
obtain bonus and equity vesting.

27.     David Davitt, Head of Business Insights & Analytics, quickly called Plaintiff after Mr.
        Gosh sent this email, and emphasized the need to maintain confidentiality regarding this
        spreadsheet because "our calculation of ASP is complicated" and "the ASP calculation is
        dynamic" and "Jho Outlaw (Chief Revenue Officer) and her team put a lot of work into
        estimating ASP and communicating it to our stakeholders."

28.     On November 9, 2021, Plaintiff met one-to-one with Isaac Ro, the Chief Financial
        Officer. He emphasized the need to conduct high-quality studies to support the ECS
        business. Plaintiff's reason for requesting a meeting with Mr. Ro was to develop a
        proposal requesting a budget of $100,000 to $150,000 to conduct the necessary studies to
        support the ECS business. Most of this meeting was Mr. Ro providing tips on how to
        improve the PowerPoint deck (he did not approve Plaintiff's funding request). Instead, he

encouraged Plaintiff to continue seeking feedback from other members of the CEO's staff and for his department to be a "cross-functional effort."

29.    On November 15, 2021, CEO Eric Schadt on an Earnings Call for the Q3 2021 Results stated the following: "For those of you who don't know the IVF market, it is a highly concentrated market comprised of sophisticated and science-driven prescribing physicians . . . We're proud that the upgraded version of our ECS product is resonating well, and has allowed us to take market share in key national IVF accounts. While the volumes associated with these accounts wins are not part of our third quarter results due to timing, we are encouraged by the ordering trends we're seeing out of these accounts in the fourth-quarter thus far, as highlighted in our earnings call deck."

30.    On that same November 15, 2021 Earnings Call, Isaac Ro stated the following: "First, the IVF market continues to expand, which we think bodes well for the long-term outlook of our business. Against this backdrop, we expect our recent investments in sales force expansion will translate to accelerating growth as we turn the page to 2022."

31.    Both Eric Schadt and Isaac Ro presented an optimistic future for this business, without mentioning a known, pre-existing, and fundamental problem with the way Sema4 billed payers for ECS tests ordered from IVF clinics for their patients.

32.    During the Earning Call, Brandon Couillard, an investor, asked the following question: "Just a high-low, would you level set us on where we stand in terms of the reimbursement process, how discussions have progressed on that front, and we're kind of your expectation that perhaps we begin to see the ASP trend bottom out kind of by mid next year that you alluded to in terms of some milestones on the oncology flunk?"

14

33.     Isaac Ro said the following in response to Brandon Couillard's question: "Yes, that's exactly right, Brandon. So in general, on reimbursement, I'd say there are puts and takes there that together lead us to our expectation that 2022 will be far more stable reimbursement year than this year has been. We're most of the way through the contract conversations that we touched on last quarter and that's something where we feel very good about, the path to driving upside over the long term . . . I think if we just get reimbursement in line with the market rate on ECS, we'll be just fine.  And that's exactly the path that we're on." However, that was <u>NOT</u> the path that Sema4 was on. These statements are false.

34.     On November 17, 2021, Plaintiff joined a cross-functional team and participated on a call with Eric Schadt, Rong Chen, and Li Li Chen (Rong & Li Li are married). The team was discussing a project to analyze data and write a new research paper to be published in a medical journal that would demonstrate the clinical and economic benefits of ECS testing. Mr. Schadt said that the preliminary data was "very impressive" and would be a "substantive contribution to the literature." He stressed the importance of "maintaining confidentiality" around this project.

35.     On December 7, 2021, Plaintiff had a one-to-one meeting with their manager, William Oh, to seek guidance on how to get budget funding to conduct a legitimate study for the ECS product. William stated that ECS was "too important to fail" but did not have specific actions related to Plaintiff's budget request. Instead, he encouraged Plaintiff to keep working with the cross-functional team and to seek support from other executives who reported to the CEO.

36.     Publicly, to investors and test-ordering physicians, ECS was described as a comprehensive panel to test for many genetic diseases (up to 501). In reality, payers did not recognize the medical necessity for ordering and generating test results for all of these genes.

37.     For physicians, the ECS test was advertised and sold as one comprehensive panel. In reality, Sema4 would maximize reimbursement by breaking the test results into multiple smaller panels and submit these smaller panels to commercial payers and State Medicaid programs knowing that some of these panels were either not covered or not contracted. The ECS business model was a shotgun approach. Inundate payers with multiple panels, knowing that some would be denied, but some would be covered. This is why Sema4 had so much difficulty in calculating their Average Selling Price. Of the total dollar amount that they submitted to payers for each ECS test, only some would be covered (reimbursed).

38.     From the SEC FORM 10-K dated December 31st, 2021, Sema4 claimed that "We maintain protocols intended to identify any overpayments. From time to time, we may identify overpayments and be required to refund those amounts to governmental payors." In fact, no such protocols existed (nor do they exist as of October 2023).

39.     Some of the smaller panels overlap – meaning that Sema4 routinely asked payers to pay for the same test twice.

40.     For example, considering Cystic Fibrosis (CFTR) and Spinal Muscular Atrophy (SMNA1/2), Sema4 submitted CPT codes to Aetna, a health insurance payer. Sema4 submitted to Aetna the billing code 81220 (Cystic Fibrosis genetic testing) and 81320

(SMNA1/2). Aetna had a contracted rate of $500 per Cystic Fibrosis test. On average, Sema4 received $592 per Cystic Fibrosis test.

41.     Sema4 submitted to Aetna the billing code 81329 for Spinal Muscular Atrophy. Aetna did not have a contracted rate with Sema4 for test code 81329, but on average, Aetna paid Sema4 $144 per Spinal Muscular Atrophy test. However, Sema4 also submitted to Aetna the test billing code 81479.

42.     So, in addition to submitting separate codes to Aetna for Cystic Fibrosis and Spinal Muscular Atrophy for which they received payment, Sema4 also submitted 81479, which contains a list of stacked codes, including Cystic Fibrosis and Spinal Muscular Atrophy. For the test code 81479, Sema4 received a substantial payment amount from Aetna that averaged $3,127 per patient. In other words, Sema4 maximized revenue by billing payers, at least twice for the same test.

43.     In March of 2022, Plaintiff was asked to join a team that was developing proposals for pharmaceutical manufacturers (Takeda and Pfizer) for Fabry's disease based on access to Mount Sinai data. Plaintiff does not know why the Takeda proposal was not successful, but in the 4th quarter of 2022, Gustavo Stolovitzky and Kareem Saad convened a call with the team members to inform the team that the Pfizer deal fell through. Since the team was not involved in client-facing meetings, they had to inform the team that (1) Mount Sinai was pursuing a path to cut off GeneDx's access to the Mount Sinai data that contained personal health information; and (2) Manisha Balwani, MD, MS, Chief of the Division of Medical Genetics and Genomics, did not want to collaborate with Sema4/GeneDx on a Pfizer proposal. Note: This is after the team had expressly been told by Eric Schadt that the team would be working with Dr. Balwani. Prior to this new disclosure, the team had

been instructed to include Dr. Balwani's name in the Pfizer proposal. A key component

of Plaintiff's initial employment offer was that Plaintiff would be able to conduct

important research by collaborating with Mount Sinai academic leaders and the Mount

Sinai clinical notes. Now, the team was told that they would no longer have data access –

another bait and switch.

44.     During Sema4's earnings call with investors to report fourth quarter and full year results

for 2021 on March 14, 2022, Eric Schadt made the following statement to investors:

"2021 was a transformative year for Sema4, during which we drove record test volumes

and grew our clinical, molecular and patient databases, listed on NASDAQ as a public

company, and advanced our strategic objectives to accelerate the growth of our platform

of algorithms." Isaac Ro stated "I am pleased with our results in the quarter, and as we

look ahead to 2022, I am encouraged by the trajectory of volumes and gross margins.

Investments in automation, people, and processes are now translating into tangible

efficiencies. We expect gross margins to further improve throughout 2022." What Eric

Schadt and Isaac Ro did not disclose was that the majority of this test volume (~70%)

was driven by ECS testing, had been inappropriately/illegally billed to payers, and was

facing a claw back (i.e. refund) request from United Healthcare.

45.     In fact, the transcripts from the Q4 2021 Sema4 Holdings Corp Earnings Call detail the

extent of the deception, with Eric Schadt stating that "Women's health volumes grew

33% in the fourth quarter compared to the same period in 2020." Isaac Ro stated "So

while it's still relatively small absolute values versus the women's health business, you

can clearly see that it is the fastest-growing part of our franchise, #1. And #2, we're

growing much faster than the end markets that we serve in that category."  Regarding

18

reimbursement, "I should also remind you that from a reimbursement perspective, we had a bunch of irons in the fire this year to drive better payment so that the revenue attached to our volume starts to catch up. And if we do that, that will also be important to improving our gross margin profile in the second half of the year."

46.    Sema4's SEC 10-K (March 14, 2022), acknowledged that "Our third-party payors have also requested, and in the future may request, audits of the amounts paid to us. We have been required to repay certain amounts to payers as a result of such audits, and we could be adversely affected if we are required to repay other payers for alleged overpayments due to lack of compliance with their reimbursement policies."

47.    Payer negotiations are routine for compliant and well-functioning healthcare companies. Therefore, investors and employees were easily duped by this broad disclaimer. The company failed to disclose (1) the specific risk; (2) the cause of the risk; and (3) the magnitude of the risk.

48.    However, within six months of joining Sema4, by April 2022, Plaintiff was fully aware that the majority of Sema4's revenue from ECS testing was facing a significant threat due to concerns being raised by United Healthcare.

49.    Plaintiff only knew that United Healthcare was seeking a claw back (refund) for ECS testing. Plaintiff was not made aware of other payer disputes. However, Gustavo Stolovitzky, Chief Science Officer, did state to Plaintiff that the UHC issue had been discussed at the level of the Board of Directors and that the "risk of contagion" was significant. Meaning that other payers could seek similar refunds.

50.    Plaintiff proposed a legitimate project and requested budget to generate a factual and transparent report that help Sema4 to address UHC's concerns.

51.     Plaintiff emailed their manager, William Oh, on April 8, 2022, requesting funding to support a project for ECS payment negotiations, and ultimately, increase ASP. Instead of supporting Plaintiff's budget request, he called Plaintiff that same day regarding Plaintiff's email. He cautioned Plaintiff about sending the email to other members of the CEO's executive team (Plaintiff never did send it). Instead, he advised Plaintiff to speak with several members of the CEO's Management Team and try to gain their support for budget, but they all deferred and suggested that Plaintiff speak with someone else.

52.     By April, 2022, Plaintiff was asked to support a very specific part of the UHC billing/reimbursement project. Specifically, Plaintiff was asked to generate evidence to help counter UHC's claim that ECS testing provided no clinical or economic benefit (utility).

53.     In the May 12th, 2022 press release, "Sema4 Reports First Quarter 2022 Financial Results and Business Highlights" Sema4 continued to double-down on the claim that they "delivered record test volume" and that "testing volumes were up 27% in the first quarter of 2022 compared to the same period of 2021" and that they were "accelerating the Company's path to improving gross margins and ultimately towards profitability," while failing to mention the increasing challenges that the company was facing internally regarding reimbursement. In fact, the SEC Form 10-Q for March 31st, 2022 claimed that gross margins were improving and "enabled by our efforts across billing, collections, reimbursement, lab efficiency and procurement."

54.     Plaintiff's project, which was ongoing at the time of the May 12th investor call was not aligned to the public statements. While there was a benefit a clinical benefit to genetic testing for specific families at high-risk for transmitting genetic disease to their offspring

(e.g., Ashkenazi Jewish), this benefit was most pronounced for families with the ability to access IVF clinics to select embryos that did not have severe or lethal genetic disease. However, the clinical benefit for genetic testing at the scale of the population (i.e., any family planning to have kids, regardless of whether or not they accessed an IVF clinic), was modest at best. The economic benefit to payers at this large scale could not be justified. Apparently, the upfront cost of the ECS test, when applied at the population level, did not produce enough benefit (i.e., cost savings) to convince UHC to provide coverage. Plaintiff was not involved in any actual meetings with UHC. Plaintiff was providing background support. However, the fact that (1) UHC did not fully cover/reimburse the ECS test; and (2) the company publicly disclosed a $42 million write-down to a major commercial payer, leads Plaintiff to conclude that the clinical and economic benefit of ECS testing was not compelling. (Case No.: 3:22-cv-01131-JBA, Helo v. Sema4).

55.    During the April 2022 timeframe (before the May 12th, 2022 investor call), Plaintiff worked on an audit of 150 cases that were flagged by United Healthcare as being problematic. Plaintiff was involved in email discussions with Eric Schadt, Li Li, Alan Copperman, Rong Chen, and Ryan Shewcraft. The team was tasked with estimating (1) the likelihood that these prospective parents would have a child with a genetic disease; and (2) the payer direct medical costs that these children would cost.

56.    Plaintiff worked on a specific and legitimate project to demonstrate the clinical and economic benefit of ECS testing. Plaintiff had no involvement with the code-stacking scheme. The spreadsheet was shared with Plaintiff (carelessly and unintentionally) and was only peripherally related to Plaintiff's budget impact work. It was only in retrospect,

21

after Isaac Ro (Chief Financial Officer) left the company that Plaintiff began to hear comments that his departure was related to inappropriate billing for the ECS test. Plaintiff did not recognize the code-stacking scheme because, for Plaintiff's department, price or ASP (average selling price) is simply an input. Plaintiff's department constructed legitimate budget impact models to show to payers: (1) how much the payer is estimated to pay upfront for ECS testing to be performed on an IVF population; and (2) the estimated downstream medical cost savings that payers will achieve due to families being able to avoid selecting embryos with severe (and potentially lethal) genetic disease.

57.     Although Sema4 leadership commissioned this project, they did not support Plaintiff's budget request (~$150K) to strengthen the economic burden study. Plaintiff was responsible for the section "Economic Burden." Other team members were responsible for the other sections. The paper was eventually rejected by the journal Nature.

58.     On June 16th, 2022, the transcripts from the Goldman Sachs Global Healthcare Conference reveal that the ruse was continued with Katherine Stueland as the new CEO. She stated to investors that "There is top line revenue growth that as we think about expanding utilization of our testing and reproductive health in the pediatric setting as well as oncology health systems."

59.     The June 30, 2022, SEC 10-Q publicly acknowledged the risk of a payer Audit: "As an integral part of the Company's billing compliance program, the Company has and will periodically assess its billing and coding practices, respond to payor audits and overpayment claims, and investigate reported failures or suspected failures to comply with federal and state healthcare reimbursement requirements, which may arise without fault on the part of the Company. From time to time, the Company may have an

22

obligation to reimburse Medicare, Medicaid, and third-party payors for overpayments regardless of fault." Again, the company failed to disclose (1) the specific risk; (2) the cause of the risk; and (3) the magnitude of the risk.

60.   In August 2022, Plaintiff was transferred out of Medical Affairs. Plaintiff's previous manger was William Oh (Chief Medical Officer) and their new manager was Gustavo Stolovitzky (Chief Science Officer).

61.   Shortly after Plaintiff's transfer, on August 14, 2022, Plaintiff became aware that a significant write-down had been declared to investors in connection with negotiations with "one of [Sema4's] larger commercial payors regarding the potential recoupment of payments for Sema4 carrier screening services rendered from 2018 to early 2022."

62.   Mr. Stolovitzky informed Plaintiff that, while the write-down declared to investors was $30 million, the actual revenue risk was more like "$50-60 million" and potentially higher due to the "risk of contagion" if other payers became aware of the company's billing practices.  Mr. Stolovitzky's statement directly contradicted the statement made by Kevin Feeley, the new CFO from the transcripts from the Q2 2022 Sema4 Holdings Corp Earnings Call, August 15th, 2022, where he stated to investors that "We believe this reversal of revenue accurately reflects and captures the potential risk of recoupment from our entire portfolio of third-party payers, which is a risk that is common in our industry." Mr. Feeley went on to elaborate during the Q&A that a major payer had conducted an "audit span back 3 years," which means that the billing fraud was ongoing prior to Plaintiff's offer of employment.  Mr. Feeley characterized it as a "dispute" and did not disclose details of code-stacking or double-billing. In retrospect, the Q&A appears highly scripted, with only one question directed towards the disclosed write down.

63.     The above quotes from Mr. Stolovitzky occurred during a one-to-one meeting shortly
        after an article was published on August 14, 2022. This information was shared with
        Plaintiff in context of a research paper that they were working on to demonstrate the
        clinical and economic benefit of ECS testing. Eric Shadt was leaving Sema4/GeneDx,
        and Mr. Stolovitzky would become the new Chief Science Officer. Therefore, Mr.
        Stolovitzky was seeking to expedite the ECS research paper because the article
        announcing the $42 million write-down had caused significant downward pressure on
        Sema4's stock price.

64.     The press release on August 15th, 2022 titled "Sema4 Announces Continued
        Restructuring, Business Highlights, and Reports Second Quarter 2022 Financial Results":
        Katherine Stueland announced the first round of layoffs and major changes to the
        Executive Management Team (departure of Eric Schadt and introduction of Matt Davis,
        Chief Product & Technology Officer). These announcements served as a convenient
        distraction from the systemic problems that plagued the Women's Health business where
        they continued to report volume growth and, for the first time, reported a "30.1 million of
        revenue adjustment."

65.     Since August 15th, 2022, there have been five major rounds of lay-offs. The company has
        exited about ~1,000 employees, from ~1,900 to ~900 presently. The new Management
        Team (defined as those executive leaders who report directly to the CEO), have not been
        transparent with these lay-offs. They happen quickly and (apparently) unexpectedly.
        Managers are given notice that employees on their team have been terminated and are
        required to notify affected employees that day. It is therefore difficult to estimate the full
        effect of all the layoffs. Plaintiff's transition over to another division happened during

one of these rounds of layoffs. There was an ancillary reorganization that took place during the layoffs. William Oh (Chief Medical Officer) told Plaintiff that Gustavo Stolovitzky (Chief Science Officer) had specifically asked for Plaintiff to be transferred to his division and the new CEO (Katherine Stueland) had approved this. This appeared to be unexpected news for William.

66.    In January 2023, Gustavo Stolovitzky hosted a Research Summit in Stamford, Connecticut. He encouraged an "open dialogue" about the future of Research at GeneDx. However, when Mr. Stolovitzky was asked the explicit question, "What is going on with our access to Mount Sinai data?" Mr. Stolovitzky declined to answer the question and instead stated, "I prefer to go back to the previous question because we need to discuss it some more." One week later, at a Senior Leadership Team ("SLT") hosted by Katherine Stueland in New York, Ms. Stueland disclosed that the fractured relationship between Mount Sinai and GeneDx had been discussed with the GeneDx Board of Directors. She also disclosed that Gustavo Stolovitzky and Kareem Saad had led this discussion with the Board.

67.    The GeneDx corporate culture under Katherine Stueland and the new executive leadership team was a hostile workplace. In Plaintiff's 20+ year career working for publicly traded companies, Plaintiff had never encountered such an unhealthy work environment before. Co-workers frequently confided in Plaintiff about their anxiety, frustration, and deteriorating mental health status. The leadership team was sorely out of their depth with regards to managing a publicly traded company. Large-scale layoffs occurred quarterly, with no regard to existing client relationships or patient needs.

68.  The hostile culture of GeneDx extended beyond their employees to affect patients, patient families, payers, and physicians. What made the GeneDx culture most pernicious was their manipulation of emotions to "End the Diagnostic Odyssey" for babies and pediatric patients with severe genetic disease. One townhall opened with an image of a sick baby in the neonatal intensive care unit. Townhalls and leadership retreats would feature guest speakers who were the mothers of children with severe genetic disease. On one hand, they proclaimed that their motivation was to help parents receive an accurate diagnosis for their children. On the other hand, they engaged in improper and illegal billing practices to maximize revenue. What Plaintiff regrets the most about his time at GeneDx is the way they carelessly stuck parents (specifically the rare disease moms) with significant bills (either in the form of copays or fully responsible for a $9,000 charge) at the most desperate and vulnerable point in their entire lives. Plaintiff still genuinely believes that an early and accurate diagnosis can bring significant clinical and economic benefits to patients, their families, and society writ large. However, GeneDx is on the wrong path. They employ unethical and illegal methods to maximize profits from those who suffer the most from rare diseases. They have not earned the right to exist as a company. They cannot be entrusted with this vital role.

69.  The executive leadership team consisted of a majority of ex-Invitae employees: Katherine Stueland, Matt Davis, Jen Brendel, Karen Ponchner, and Melanie Duquette (hired September 2023). Together, they implemented a culture of "OKRs" – Objectives & Key Results. They did not implement or encourage a culture of compliance (Note: See comments from QBR, April 11th, 2023 and MBR, June 14th, 2023). Employees were told that the OKR culture would encourage teams to work across silos by identifying Direct

26

Responsible Individuals ("DRIs") who were tasked with ensuring that priority projects were completed on time and on budget. In reality, the OKRs were fluid. For example, within twelve months, the OKRs were trimmed from five OKRs in Q3 2022 to three OKRs by Q3 2023. New projects with poor alignment to the OKRs were frequently added by panicked managers. Furthermore, successfully delivering results against OKRs did not seem to improve one's chances of avoiding one of the quarterly lay-offs.

70.    In retrospect, Plaintiff now sees that Isaac Ro authorized the code-stacking scheme and Eric Schadt sold the ECS "product" to investors.

71.    The first time Plaintiff explicitly heard that the ECS code-stacking scheme was illegal was during the Quarterly Business Review (QBR) in Gaithersburg, Maryland, on April 11, 2023. During a break, one of the meeting participants, Amanda Lindy (Head of Clinical Genetics), in the conference room asked, "What happened to the ECS business and all that revenue?" Jason Vellen, Director of Revenue Cycle Optimization said "ECS code stacking, it was illegal." Paul Kruszka, Chief Medical Officer, added "Hey Amanda, we don't discuss ECS. We don't talk about that." The discussion was extremely troubling to Plaintiff.

72.    Jason Vellen is from the legacy GeneDx business so his exposure to the Sema4 business operations is time bound. GeneDx and Sema4 did not merge operations until post-approval by the Sema4 shareholders on April 27, 2023. So, Jason may not have been directly involved in the ECS code-stacking scheme. However, Jason made remarkable comments at the Monthly Business Review (MBR) on June 14, 2023, indicating that the newly merged business (Sema4 and GeneDx) had not resolved basic billing practices.

73.     At the June 14, 2023 MBR, Jason Vellen said "We did not tell the truth . . . We told the

        patient that their prior authorization had not been approved, when in fact, we [GeneDx]

        did not submit it." This example is not related to ECS testing. GeneDx had fully exited

        the former Sema4 ECS testing business at the time this statement was made. However, it

        highlights ongoing and systemic problems that GeneDx continues to demonstrate with

        how they submit claims to payers for the sole purpose of maximizing revenue.

74.     Jason also said: "Telling the truth would have caused an extra 30 days delay in payment."

        This means that if they had followed proper procedures, they would have filed a claim

        with the payer, then waited for the payer to approve or deny, and the patient would be

        responsible for part of the testing costs via the patient's co-pay. By telling the patient (or

        patient's family in the case of infant or pediatric genetic testing) that the prior

        authorization approval was denied by the payer (when in fact they hadn't even submitted

        a claim to the payer), they were essentially informing the patient that they were

        responsible for the full cost of testing, which could be up to $9,000! GeneDx is then able

        to seek full payment immediately from the patient instead of waiting for an insurance

        company to review and reimburse for a lower amount. Further, he said, "When we submit

        prior authorization [request to health insurance payer] on behalf of a doctor [who is

        ordering a genetic test on behalf of a patient] we are not properly documenting it."

75.     Jason Vellen then went on to describe the need to build a proper revenue cycle

        department: "Access services, pre-registration, registration, authorization, financial

        counselling, PA [prior authorization] support, appeals . . . all are missing." Another

        discussant made a comment that may be worth investigating: "New York Medicaid MCO

        [managed care organization] is non-covered, meaning Emblem Health must use LabCorp

to perform testing." GeneDx should not be performing tests for Emblem Health patients and submitting claims for payment to this New York State Medicaid MCO. Plaintiff has evidence to show that Sema4 was indeed submitting claims to Emblem Health. Emblem/GHI/HIP is the combined entity of Emblem, Group Health Incorporated ("GHI"), and Health Insurance Plan of Greater New York ("HIP"). Emblem/GHI/HIP pays for care for members of their NY State Medicaid Managed Care plan. The advantage for Sema4 in submitting >700 claims to Emblem, despite low claims approval rates and low payments received, was that it bolstered their assertion on the August 2021 investors call that "volume growth is strong."

76.     Given Plaintiff's realizations of how GeneDx runs their business and deceived their own employees, Plaintiff decided to interview for roles in Pharma, as a VP, which is Plaintiff's most recent title prior to joining Sema4. However, it has become apparent to Plaintiff that the Sema4/GeneDx debacle has tarnished his reputation among Plaintiff's pharma colleagues. Plaintiff is no longer certain that Plaintiff can get a commensurate job in the pharmaceutical industry. Plaintiff would have never accepted an offer of employment with Sema4/GeneDx had Plaintiff known about the fraudulent and negligent misrepresentations made by the Company to conceal the code stacking issue that preceded Plaintiff's employment. Plaintiff would have remained employed by his previous employer and received their bonus and equity compensation.

77.     On a team call with NorthShore Health in Chicago, an executive clinician said that they were "exhausted by all the changes and confusion caused by Sema4." Avera Health in South Dakota said their partnership with Sema4 had "cost them a lot of money." Plaintiff has never experienced negative feedback at this level in any former roles. It is unlikely

that Plaintiff will be able to form research partnerships with these institutions in the future. The ability to develop research partnerships with healthcare systems is a major requirement for executives in Plaintiff's area of expertise. Plaintiff's affiliation with Sema4/GeneDx has damaged his reputation.

78.   Furthermore, if Plaintiff's knowledge contained herein becomes public, Plaintiff is concerned that former and current executives at Sema4 and GeneDx will seek to secretly undermine Plaintiff's reputation.

79.   There are four programs in Research:  Health Economics & Outcomes Research (HEOR) (Asian Team Lead), Pharma Support (Asian Team Lead), Algorithm Development (Asian Team Lead), and Long Read Sequencing (White Team Lead). All three Asian Team Leads were laid off on October 30th, 2023. However, the White Team Lead remains employed. In addition, GeneDx is vastly underrepresented by Black and Hispanic minorities. One of the few black employees at GeneDx was a scientist on Plaintiff's team. He was also laid off on October 30th, 2023. The majority of employees in the Research department that were laid off on October 30th, 2023 were of Asian ancestry.

80.   As a middle-aged Asian male and a member of the senior leadership team (45-50 senior executives), Plaintiff was not given access to meetings with Ms. Stueland (the CEO). In all of Plaintiff's prior roles, it was routine for Presidents of multi-billion dollar business units to meet quarterly with their senior leadership team. Plaintiff found it odd that the CEO of a small company with ~$200M in annual revenue did not have time to meet with her SLT. Plaintiff was not aware of any Asians on the SLT ever having an opportunity to dialogue with Ms. Stueland. During her tenure as CEO, Plaintiff only presented to her once. In October of 2023, Plaintiff was asked to attend a meeting with Ms. Stueland and

her Management Team (executive leadership team) to present a proposed rule from the FDA to regulate laboratory developed tests (LDTs). When Plaintiff proposed conducting an internal lab audit to ensure that GeneDx could comply with potential future regulations, Kevin Feely, CFO, commented, "We have a lot going on in Q4 to close out the year, can we push this off to January?" Thus, dismissing Plaintiff in front of everyone in attendance.

81.   Plaintiff's manager, Gustavo Stolovitzky, met with Plaintiff one-to-one about once every six weeks on average. Plaintiff mentioned this to the HR lead for Research, Melissa Gibson. Mr. Stolovitzky then made some minor efforts to avoid cancelling Plaintiff's bi-weekly meetings less frequently. For the past three months, Mr. Stolovitzky has managed to meet with Plaintiff about once every month for 30 minutes. This is in sharp contrast to Plaintiff's management style, where Plaintiff met with all three of his direct reports weekly.

82.   Upon information and belief, Plaintiff suspects that a higher proportion of SLT members over the age of 40 were laid-off compared to younger employees. Many of these exits are notable: Jerry Conway (White male > 40), Chris Sands (White male >40), Rong Chen (Asian male >40), Li Li Chen (Asian female >40), Ke Hao (Asian male >40), Jun Zhu (Asian male >40), Karen White (White female >40), and Gustavo Stolovitzky (White male>40).

83.   GeneDx has also purged their ranks of Asian employees: (1) The Research department began 2023 with a majority of Asian employees (~25 FTE total, of which, about 18 (or >70%) were Asian). The two most recent lay-offs in Q2'23 and Q3'23 (which including Plaintiff on October 30th, 2023) constituted a total of ~12 FTE, which comprised nine (9)

Asians, one (1) Black male, one (1) White woman, and one (1) White man; (2) The SVP of Market Access, Jerry Conway (White male) was terminated and replaced with a younger, White woman, Ashley Arthur. The SVP of Commercial (White male – Chris Sands) was terminated and replaced with a White woman, Melanie Duquette.

84.    Plaintiff's team was overloaded with ten major projects (in addition to numerous small projects for internal stakeholders). The majority of these projects were added sporadically over time by Mr. Stolovitzky and did not align well to the company's OKRs. Plaintiff became concerned about their team's ability to deliver key results against the company's OKRs. In October of 2023, Plaintiff asked his manager, Mr. Stolovitzky, for permission to request from Finance an additional budget of $125K to complete a key research paper. He was very upset with the prospect of spending budget and said the current team should be able to do it without outside help. He then requested the slide Plaintiff presented which listed Plaintiff's team's various project commitments. Shortly afterwards, Katherine Stueland sent Plaintiff an email requesting that Plaintiff review this project at the QBR on October 19th, 2023. However, Mr. Stolovitzky told Plaintiff that he preferred to be the sole presenter at QBR and would not give Plaintiff time on the agenda to demonstrate what Plaintiff's team was doing and where the team needed help. Instead, Plaintiff's department's section of QBR consisted of two slides. These two slides were the very last slides on the last day of a two-day agenda. Plaintiff's department received about 5 minutes of discussion. Gustavo spent ~25 minutes presenting the long read sequencing program that had a White male team lead (Scott Neuman). Out of four team leads for Research (3 Asians and 1 White), Scott was the only one who was not laid-off on

October 30th, 2023. The White team lead was provisioned with the largest budget in the Research department (in excess of $400,000). Plaintiff's budget was only $60,000.

85.     The four programs in Research were: Health Economics & Outcomes Research, Pharma, Algorithms, and Long Read Sequencing. To the best of Plaintiff's recollection, Research had 20-25 FTE at the start of 2023. The profile of each team is as follows:

    a.  Mitchell Higashi (Lead, Asian male >40), 3 team members: Kelly Parsons (White female>40), Ryan  Subaran (Black male, <40), Zongzhi Liu (Asian male, >40).

    b.  Jun Zhu (Lead, Asian male>40), 5 Asian team members

    c.  Li Li Chen (Lead, Asian female>40), 4 Asian team members, 2 White team members.

    d.  Scott Neuman (Lead, White male>40), 4 Asian team members (1 female), 1 White team male.

86.     On August 16th, 2023, Plaintiff was participating in a Medical Affairs monthly meeting called Scientific Exchange. Paul Kruszka is the Chief Medical Officer. Kirsty McWalter reports to Dr. Kruszka and manages a program called GeneMatcher. The GeneMatcher program has published >100 articles in peer-reviewed journals over the past twelve months. GeneMatcher creates incentives for physicians to order genetic tests from GeneDx in exchange for the added-value that physicians receive to have their name and institution listed as co-authors on research papers published in medical journals. This transfer of value to physicians and health systems is not reported as required under The Physician Payment Sunshine Act. GeneDx is considered a "Reporting Entity" by CMS and the test ordering physicians and health systems are "Covered Recipients." During the August 16th meeting, which was recorded on MS Teams, Kirsty McWalter stated, "These

physicians got an added value for ordering their exome and genome tests through GeneDx." The meeting was recorded on MS Teams and posted to the Scientific Exchange MS Teams group chat. If the recording has been deleted, it will indicate that GeneDx is destroying evidence. The GeneMatcher program is an example of how the GeneDx Medical Affairs department engages in illegal methods through improper physician relationships to support commercial goals to increase the volume of tests ordered.

87.     On September 21st, 2023, Plaintiff attended a meeting called "All Hands" at the GeneDx's new New York office (PENN 1, 1 Pennsylvania Plaza, New York, NY 10119). The All Hands meeting was for all employees both on site and remote. While at the New York office, Plaintiff met with two local team members (Zongzhi Liu and Ryan Subaran, both are residents of New York). Plaintiff also joined a weekly Research Leadership Team meeting remotely. The weekly Research LT meetings were usually hosted in Stamford, Connecticut.

88.     Over the past 12 months, Plaintiff visited the GeneDx laboratory site three times in Gaithersburg, Maryland. Two of these meetings were Quarterly Business Reviews and one meeting was to evaluate buccal swabs as a method to collect genetic samples.

89.     Plaintiff visited the GeneDx's headquarters in Stamford, Connecticut at least three times over the past twelve months. One meeting was for a two-day Research Summit for all Research employees in Mr. Stolovitzky's Department and one meeting was for his Research Leadership Team meeting.

90.     In October 2023, upon the insistence of Plaintiff's manager, Gustavo Stolovitzky, Plaintiff began supporting a project known as "Claims Denials." GeneDx tests are

routinely denied by health insurance payers. The denial rate ranges from 50-65% of all tests submitted for reimbursement. The billing system is called XiFin. The XiFin data files are material evidence. Plaintiff has a list of all payers and providers who were billed by GeneDx using the XiFin billing system. Upon reviewing the XiFin data files, Plaintiff was dismayed to learn that a code-stacking scheme is still actively employed by GeneDx for the purpose of maximizing payments across all categories of payers: Medicare, State Medicaid Programs, and Commercial Payers. All payers are exposed to the risk of paying twice for one test. The scale of the code stacking scheme requires active involvement from the CEO, Katherine Stueland; CFO, Kevin Feeley; and Chief Technology & Product Officer, Matt Davis. When the new GeneDx Management Team exited the Women's Health and Oncology businesses, they did not abandon the code-stacking scheme. They simply transferred the code-stacking scheme to maximize revenue from testing newborns and pediatric patients for rare diseases.

91.    In September of 2023, Plaintiff was diagnosed with significant hypertension due to elevated stress and anxiety created by a toxic work environment with constant threats of lay-offs and retaliation against anyone who was perceived to question or criticize the company's culture and work environment. By September 2023, large rounds of lay-offs were occurring on a quarterly schedule. In fact, by July of 2023, Jason Vellen abruptly exited the company after raising a legitimate compliance risk in April 2023. These two examples heighted Plaintiff's fear and anxiety that GeneDx was a retaliatory company. This new diagnosis of significant hypertension is documented on Plaintiff's medical chart with his primary care provider. Plaintiff is now being treated for hypertension and faces an elevated risk of a heart attack.

92. Because of the toxic and hostile workplace at GeneDx, Plaintiff has been prescribed medication for insomnia and hypertension. Plaintiff have become deeply suspicious of the for-profit healthcare industry and is fearful that it will be difficult to find employment at any company that is aware of the Sema4/GeneDx debacle. Plaintiff believes that their business practices are so horrendous that they will inevitably be exposed. Plaintiff is therefore seeking employment in the non-profit sector. Above all else, Plaintiff is concerned about the lasting damage that GeneDx will have for the sector that conducts legitimate rare disease testing for newborns and pediatric patients.

93. Plaintiff is seeking compensation for: (1) lost wages, bonus, and stock compensation from Plaintiff's previous role (due to being lured into this role with false and fraudulent claims); (2) the lost value of additional compensation that Plaintiff was promised in their employment letter which clearly did not materialize over two years at GeneDx; (3) lost future earnings potential due to a tarnished reputation from being associated with GeneDx; and (4) the full value of Plaintiff's testimony for other stakeholders.

94. Plaintiff was unlawfully terminated on October 30, 2023 from employment because and substantially because of his age and race. GeneDx discriminated against Plaintiff in the terms, conditions, and privileges of employment on account of Plaintiff's protected status.

95. GeneDx deceived and participated in an enterprise that threatens to bring down the entire system of trust that underpins the commercial lab sector. Plaintiff's affidavit shows that GeneDx's executive management team displays a duality of purpose that is stunningly mind-blowing. On one hand, they catalyze a deep level of employee engagement with their campaign to "End the Diagnostic Odyssey" and elevate the common cause with rare

disease moms. On the other hand, they commit systematic fraud and exploit weaknesses in the billing and payment system for rare disease genetic testing for the sole purpose of maximizing revenue. Plaintiff would have never joined the Company had he known this information and not been deceived by the executive management, and Plaintiff would have remained employed with his previous employer.

## CAUSES OF ACTION

### COUNT ONE: FRAUDULENT MISREPRESENTATION AND INDUCEMENT

96.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 95, as if fully set forth herein.

97.   Defendant's actions as set forth above were committed knowingly and fraudulently in order to misrepresent to Plaintiff the terms, conditions, and benefits of his employment with the Defendant.

98.   Defendant made deliberately false statements to Plaintiff with the sole intention and purpose of inducing the Plaintiff to first join with, then to remain with Defendant long enough to use him as part of their unethical and illegal methods to maximize profits.

99.   The specific misrepresentations made by Defendant included statements by Defendant's corporate officers including Eric Schadt, Defendant's former CEO, Isaac Ro, Defendant's former CFO, William Oh, Plaintiff's former manager, misrepresented the financial health of the company, presented an optimistic future for the business, and misrepresented the mission of Defendant in order to galvanize Plaintiff to toe the line:

   a.   Isaac Ro, CFO, declared during an August 2021 investor call that, "Volume growth is strong and we remain confident in our long-term goal of delivering $500 million in 2023 revenue as we partner with health systems, expand the menu

of offerings, and scale the business." A press release about the call stated: "Total

revenue for the second quarter of 2021 was $46.9 million, compared to $30.1

million in the second quarter of 2020. Revenue growth was driven primarily by an

increase of volume in Women's Health and Oncology solutions, along with

growth in collaboration service activities due to the execution of three new third-

party contracts." However, Defendant failed to disclose that they were in a

payment dispute with a third party payer, United Healthcare, during Plaintiff's

interview and hiring process;

b.  Then upon joining, Plaintiff was repeatedly assured by Eric Schadt, Isaac Ro, and

William Oh that Defendant had been fully vetted by the SEC during the

SPAC/IPO process and then presented an optimistic future for the business

without mentioning a known, pre-existing, and fundamental problem with the way

they billed payers;

c.  In addition, after joining, Plaintiff would be told that Mount Sinai was pursuing a

path to cut off Defendant GeneDx's access to the Mount Sinai data that contained

personal health information, which was a key component of his initial

employment offer. In doing so, Defendant GeneDx fraudulently induced Plaintiff

to accept employment and remain employed at Defendant. Plaintiff was told he

would be able to conduct important research by collaborating with Mount Sinai

academic leaders and the Mount Sinai clinical notes. This was a lie;

d.  Per Plaintiff's September 15, 2021 employment agreement, his bonus would be

35% of his base salary and he was eligible to participate in the Company's annual

equity program. Defendant targeted to award him the equivalent of approximately

$500,000 (five hundred thousand dollars) in value annually through this program. Then, once on board, his bonus was severely reduced to a mere 6.4% of his base salary despite being promised 35% of his base salary and his new annual RSU grant for 2023 was about $38,250, which was a vast departure from the original $500,000 that was communicated in his offer letter. His employment agreement also included an RSU agreement and Options award agreement. The total value of the agreements was $1.6 million. Each of the awards was subject to a four-year vesting schedule. Plaintiff would be terminated October 30, 2023. The damages that resulted from this fraudulent inducement include lost wages and benefits;

e.  Defendant GeneDx would engage in improper and illegal billing practices to maximize revenue specifically, code stacking, and misrepresent an optimistic future for the business, which started long before Plaintiff was hired. Thus, Defendant GeneDx hired him knowing they were employing unethical and illegal methods to maximize profits from those who suffer the most from rare diseases; and

f.  Plaintiff believed in their campaign to "End the Diagnostic Odyssey" only to discover that the only cause they held dear was profit. If Plaintiff was aware of this before he joined, he would have remained employed with his prior employer and continued to obtain bonus and equity vesting. Now, he has been terminated without cause and his reputation tarnished among his pharma colleagues due to his association with Defendant despite taking no part in their dishonorable practices.

100. Defendant was aware that Plaintiff was relying on these misrepresentations when he accepted the terms of his employment Agreement and continued to be employed.

101. Plaintiff justifiably relied on Defendant's promises as aforesaid.

102. As a result of the Defendant's fraudulent misrepresentations, Plaintiff has suffered harm, and continues to suffer harm.

103. If Plaintiff had known that Defendant did not intend to deal with integrity and good faith in performing its obligations under the employment Agreement and conduct its business in an ethical manner, Plaintiff never would have commenced or continued his employment with Defendant.

104. The fraudulent misrepresentations of the Defendant caused the Plaintiff to suffer losses and damages as a result of lost wages, benefits, and incentives at another company which Plaintiff left to work at Defendant based on the fraudulent misrepresentations set forth above.

105. Further, the Plaintiff is entitled to punitive or exemplary damages pursuant to the common law for its willful and fraudulent misconduct as set forth herein above.

**COUNT TWO: NEGLIGENT MISREPRESENTATION**

106. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 105, as if fully set forth herein.

107. Defendant made a series of negligent misrepresentations to the Plaintiff regarding the terms and conditions of his employment with Defendant.

108. Defendant had a duty of care to interact with its employees including the Plaintiff in a truthful manner and to act with honest purpose and intentions in stating the terms and conditions of his employment with Defendant.

109.    The Defendant's duty of ordinary care in its communications with its employees is based in part upon the employment relationship it established by written Agreement with the Plaintiff.

110.    The Defendant's duty of care in its communications with its employees is based in part on its unique relationship with its employees.

111.    Pursuant to the employment Agreement between the Plaintiff and Defendant, the Defendant had an implied obligation to deal in good faith with the Plaintiff with regard to the subject of the Agreement.

112.    The obligation to deal in good faith and with fairness with the Plaintiff includes the obligation to take reasonable care in making representations regarding the applicable terms and conditions of employment on which the Plaintiff's livelihood depends.

113.    Defendant breached its duty of care to the Plaintiff in that it made negligently false representations of existing fact in that it:

    a.  misrepresented the financial health of the company, presented an optimistic future for the business, and misrepresented the mission of Defendant in order to galvanize Plaintiff to toe the line;

    b.  Isaac Ro, CFO, declared during an August 2021 investor call that, "Volume growth is strong and we remain confident in our long-term goal of delivering $500 million in 2023 revenue as we partner with health systems, expand the menu of offerings, and scale the business." A press release about the call stated: "Total revenue for the second quarter of 2021 was $46.9 million, compared to $30.1 million in the second quarter of 2020. Revenue growth was driven primarily by an increase of volume in Women's Health and Oncology solutions, along with

growth in collaboration service activities due to the execution of three new third-party contracts." However, Defendant failed to disclose that they were in a payment dispute with a third party payer, United Healthcare, during Plaintiff's interview and hiring process;

c.  Then upon joining, Plaintiff was repeatedly assured by Eric Schadt, Isaac Ro, and William Oh that Defendant had been fully vetted by the SEC during the SPAC/lPO process and then presented an optimistic future for the business without mentioning a known, pre-existing, and fundamental problem with the way they billed payers;

d.  In addition, after joining, Plaintiff would be told that Mount Sinai was pursuing a path to cut off Defendant GeneDx's access to the Mount Sinai data that contained personal health information, which was a key component of his initial employment offer. In doing so, Defendant GeneDx fraudulently induced Plaintiff to accept employment and remain employed at Defendant. Plaintiff was told he would be able to conduct important research by collaborating with Mount Sinai academic leaders and the Mount Sinai clinical notes. This was a lie;

e.  Per Plaintiff's September 15, 2021 employment agreement, his bonus would be 35% of his base salary and he was eligible to participate in the Company's annual equity program. Defendant targeted to award him the equivalent of approximately $500,000 (five hundred thousand dollars) in value annually through this program. Then, once on board, his bonus was severely reduced to a mere 6.4% of his base salary despite being promised 35% of his base salary and his new annual RSU grant for 2023 was about $38,250, which was a vast departure from the original

$500,000 that was communicated in his offer letter. His employment agreement also included an RSU agreement and Options award agreement. The total value of the agreements was $1.6 million. Each of the awards was subject to a four-year vesting schedule. Plaintiff would be terminated October 30, 2023. The damages that resulted from this fraudulent inducement include lost wages and benefits;

f.   Defendant GeneDx would engaged in improper and illegal billing practices to maximize revenue specifically, code stacking, and misrepresent an optimistic future for the business, which started long before Plaintiff was hired. Thus, Defendant GeneDx hired him knowing they were employing unethical and illegal methods to maximize profits from those who suffer the most from rare diseases; and

g.   Plaintiff believed in their campaign to "End the Diagnostic Odyssey" only to discover that the only cause they held dear was profit. If Plaintiff was aware of this before he joined, he would have remained employed with his prior employer and continued to obtain bonus and equity vesting. Now, he has been terminated without cause and his reputation tarnished among his pharma colleagues due to his association with Defendant despite taking no part in their dishonorable practices.

114.   Defendant negligently and carelessly made the misrepresentations set forth above in order to induce the Plaintiff to remain with Defendant to define and implement innovative strategies that determine product value and commercialization activities for Defendant's genomic solutions, algorithms, and pharma support program. Plaintiff was also responsible for ensuring alignment with commercial and market access strategies,

including evidence generation (i.e., conduct research studies to produce results that can be legitimately disseminated to payers to justify Defendant's pricing and to request more favorable reimbursement). This was key as Defendant engaged in improper and illegal billing practices to maximize revenue that caused a third party payer, United Healthcare, to question their charges.

115. Defendant was aware that Plaintiff relied on these negligent misrepresentations when he continued his employment with the Defendant.

116. The negligent and careless misrepresentations of the Defendant caused the Plaintiff to suffer losses and damages as a result of lost wages, benefits, and incentives at another company which Plaintiff left based on the negligent misrepresentations set forth above.

117. Defendant should be held liable on this count and Plaintiff should be awarded all full and appropriate relief.

**COUNT THREE: AGE DISCRIMINATION IN VIOLATION OF ADEA**

118. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 117, as if fully set forth herein.

119. Throughout his employment with Defendant, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of his age.

120. Plaintiff was repeatedly treated differently than his similarly situated younger coworkers including but not limited to:

   a. A higher proportion of SLT members over the age of 40 were laid-off compared to younger employees. Many of these exits are notable: Plaintiff, Jerry Conway, Chris Sands, Rong Chen, Li Li Chen, Ke Hao, Jun Zhu, Karen White, and

Gustavo Stolovitzky;

b.  During Plaintiff's time at Defendant GeneDx, his access to key people and opportunities was limited or taken from him while he and his team were overloaded with work as a middle-aged Asian man. Despite being a member of the senior leadership team ("SLT"), Plaintiff was not given access to meetings with Katherine Stueland, Defendant's CEO. In fact, Plaintiff presented to her only once. When Plaintiff proposed conducting an internal lab audit to ensure that Defendant GeneDx could comply with potential future regulations, Kevin Feely, CFO at the time, commented, "We have a lot going on in Q4 to close out the year, can we push this off to January?" Thus, dismissing Plaintiff completely in front of Ms. Stueland and her Management Team (executive leadership team);

c.  Plaintiff was qualified for his position and that he suffered an adverse employment action when he was willfully discriminated against and unlawfully discharged; and

d.  Defendant cannot demonstrate poor performance because it has failed to document any history of poor performance during the period of Plaintiff's employment because there were no issues with poor performance. Plaintiff was at all times qualified to perform his job duties and was a highly successful employee.

121.  Defendant GeneDx's conduct, by and through its agents and employees, in treating the Plaintiff in a manner unequal to other younger employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of age in violation of the ADEA.

122.   The discriminatory acts of Defendant GeneDx as described above were intentional and were motivated on the basis of Plaintiff's age.

123.   As a result of Defendant GeneDx's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT FOUR: AGE DISCRIMINATION UNDER NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXEC. LAW § 296**

124.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 123, as if fully set forth herein.

125.   Throughout his employment with Defendant GeneDx, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of his age.

126.   Plaintiff was qualified for his position and was performing in exemplary fashion at the time he was terminated.

127.   Plaintiff was repeatedly treated differently than his similarly situated younger coworkers including but not limited to:

   a.   A higher proportion of SLT members over the age of 40 were laid-off compared to younger employees. Many of these exits are notable: Plaintiff, Jerry Conway, Chris Sands, Rong Chen, Li Li Chen, Ke Hao, Jun Zhu, Karen White, and Gustavo Stolovitzky;

   b.   During Plaintiff's time at Defendant GeneDx, his access to key people and opportunities was limited or taken from him while he and his team were overloaded with work as a middle-aged Asian man. Despite being a member of

the senior leadership team ("SLT"), Plaintiff was not given access to meetings with Katherine Stueland, Defendant's CEO. In fact, Plaintiff presented to her only once. When Plaintiff proposed conducting an internal lab audit to ensure that Defendant GeneDx could comply with potential future regulations, Kevin Feely, CFO at the time, commented, "We have a lot going on in Q4 to close out the year, can we push this off to January?" Thus, dismissing Plaintiff completely in front of Ms. Stueland and her Management Team (executive leadership team);

c.  Plaintiff was qualified for his position and that he suffered an adverse employment action when he was willfully discriminated against and unlawfully discharged; and

d.  Defendant cannot demonstrate poor performance because it has failed to document any history of poor performance during the period of Plaintiff's employment because there were no issues with poor performance. Plaintiff was at all times qualified to perform his job duties and was a highly successful employee.

128.  Defendant GeneDx's conduct, by and through its agents and employees, in treating the Plaintiff in a manner unequal to other younger employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of age in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296.

129.  The discriminatory acts of Defendant GeneDx as described above were intentional and were substantially motivated on the basis of Plaintiff's age.

130.  As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost

employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT FIVE: AGE DISCRIMINATION UNDER NEW YORK CITY HUMAN RIGHTS LAW § 8-107

131.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 130, as if fully set forth herein.

132.   Defendant GeneDx has unlawfully and willfully discriminated against Plaintiff substantially because of his age as set forth above with regard to the terms, conditions and opportunities of his employment in violation of New York City Human Rights Law § 8-107.

133.   Defendant GeneDx has unlawfully and willfully engaged in disparate treatment of the Plaintiff in violation of New York City Human Rights Law § 8-107 as it took adverse actions as set forth above against the Plaintiff who was qualified for his position and was performing in exemplary fashion at the time he was terminated.

134.   Defendant GeneDx's termination decision in this case was pretextual and not legitimate and is the cause of Plaintiff's damages, as described herein, for which the Plaintiff seeks redress.

135.   As a result of the Defendant GeneDx's unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT SIX: AGE DISCRIMINATION UNDER PHRA

136.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 135, as if fully set forth herein.

137.   Plaintiff was at all relevant times a highly qualified and competent employee of Defendant, and a covered person pursuant to the Pennsylvania Human Relations Act (hereinafter, "PHRA"), Pa. Stat. Ann. tit. 43, §§ 951, *et seq.*

138.   Throughout his employment with Defendant, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of his age.

139.   Plaintiff was repeatedly treated differently than his similarly situated younger coworkers including but not limited to:

   a.   A higher proportion of SLT members over the age of 40 were laid-off compared to younger employees. Many of these exits are notable: Plaintiff, Jerry Conway, Chris Sands, Rong Chen, Li Li Chen, Ke Hao, Jun Zhu, Karen White, and Gustavo Stolovitzky;

   b.   During Plaintiff's time at Defendant GeneDx, his access to key people and opportunities was limited or taken from him while he and his team were overloaded with work as a middle-aged Asian man. Despite being a member of the senior leadership team ("SLT"), Plaintiff was not given access to meetings with Katherine Stueland, Defendant's CEO. In fact, Plaintiff presented to her only once. When Plaintiff proposed conducting an internal lab audit to ensure that Defendant GeneDx could comply with potential future regulations, Kevin Feely, CFO at the time, commented, "We have a lot going on in Q4 to close out the year,

can we push this off to January?" Thus, dismissing Plaintiff completely in front of Ms. Stueland and her Management Team (executive leadership team);

c. Plaintiff was qualified for his position and that he suffered an adverse employment action when he was willfully discriminated against and unlawfully discharged; and

d. Defendant cannot demonstrate poor performance because it has failed to document any history of poor performance during the period of Plaintiff's employment because there were no issues with poor performance. Plaintiff was at all times qualified to perform his job duties and was a highly successful employee.

140. Defendant's conduct, by and through its agents and employees, in treating the Plaintiff in a manner unequal to other employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of age in violation of the PHRA.

141. The discriminatory acts of Defendant as described above were intentional and were substantially motivated on the basis of Plaintiff's age.

142. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT SEVEN: AGE DISCRIMINATION UNDER CFEPA**

143. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 142, as if fully set forth herein.

144. Plaintiff was at all relevant times a highly qualified and competent employee of

Defendant, and a covered person pursuant to the Connecticut Fair Employment Practices Act (hereinafter, "CFEPA"), § 46a-60, *et seq.*

145.    Throughout his employment with Defendant, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of his age.

146.    Plaintiff was repeatedly treated differently than his similarly situated younger coworkers including but not limited to:

a.    A higher proportion of SLT members over the age of 40 were laid-off compared to younger employees. Many of these exits are notable: Plaintiff, Jerry Conway, Chris Sands, Rong Chen, Li Li Chen, Ke Hao, Jun Zhu, Karen White, and Gustavo Stolovitzky;

b.    During Plaintiff's time at Defendant GeneDx, his access to key people and opportunities was limited or taken from him while he and his team were overloaded with work as a middle-aged Asian man. Despite being a member of the senior leadership team ("SLT"), Plaintiff was not given access to meetings with Katherine Stueland, Defendant's CEO. In fact, Plaintiff presented to her only once. When Plaintiff proposed conducting an internal lab audit to ensure that Defendant GeneDx could comply with potential future regulations, Kevin Feely, CFO at the time, commented, "We have a lot going on in Q4 to close out the year, can we push this off to January?" Thus, dismissing Plaintiff completely in front of Ms. Stueland and her Management Team (executive leadership team);

c.    Plaintiff was qualified for his position and that he suffered an adverse employment action when he was willfully discriminated against and unlawfully

discharged; and

    d.   Defendant cannot demonstrate poor performance because it has failed to document any history of poor performance during the period of Plaintiff's employment because there were no issues with poor performance. Plaintiff was at all times qualified to perform his job duties and was a highly successful employee.

147.   Defendant's conduct, by and through its agents and employees, in treating the Plaintiff in a manner unequal to other employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of age in violation of the CFEPA.

148.   The discriminatory acts of Defendant as described above were intentional and were substantially motivated on the basis of Plaintiff's age.

149.   As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT EIGHT: RACE DISCRIMINATION UNDER 42 U.S.C. § 1981**

150.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 149, as if fully set forth herein.

151.   Defendant GeneDx has unlawfully and willfully discriminated against Plaintiff because of his race as set forth above with regard to the terms, conditions and opportunities of his employment in violation of 42 U.S.C. § 1981.

152.   Defendant GeneDx has unlawfully and willfully engaged in disparate treatment of the Plaintiff in violation of 42 U.S.C. § 1981 as it took adverse actions as set forth above

against the Plaintiff, who is Asian (Japanese ethnicity), who was qualified for his position and was performing in exemplary fashion at the time he was terminated.

153.   Defendant GeneDx's willful and premeditated termination decision in this case was pretextual and not legitimate and is the cause of Plaintiff's damages, as described herein, for which the Plaintiff seeks redress.

154.   As a result of the Defendant GeneDx's unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT NINE: RACE DISCRIMINATION UNDER TITLE VII**

155.   Plaintiff repeats the allegations of Paragraphs 1 through 154, as if fully set forth herein.

156.   Throughout his employment with Defendant, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of his race, which is Asian (Japanese ethnicity).

157.   Plaintiff was repeatedly treated differently than his similarly situated non-Asian coworkers including but not limited to:

   a.   Defendant has targeted and purged their ranks of Asians. The Research department began 2023 with a majority of Asian employees, about 25 full time employees, of which, about 18 (or >70%) were Asian. The two most recent lay-offs in Q2 2023 and Q3 2023, which included Plaintiff on October 30, 2023, constituted a total of about 12 full time employees comprised of nine Asians (75%);

   b.   Plaintiff experienced disparate treatment in comparison to a non-Asian peer, Scott

Neuman (White), who was the only lead within the Research department not to be terminated on October 30, 2023. Plaintiff and the other two leads (both Asian) were terminated;

c.  During Plaintiff's time at Defendant GeneDx, his access to key people and opportunities was limited or taken from him while he and his team were overloaded with work in comparison to non-Asian peers. Despite being a member of the senior leadership team ("SLT"), Plaintiff was not given access to meetings with Katherine Stueland, Defendant's CEO. Further, other Asians on the SLT never had an opportunity to speak with Ms. Stueland. In fact, Plaintiff presented to her only once. When Plaintiff proposed conducting an internal lab audit to ensure that Defendant GeneDx could comply with potential future regulations, Kevin Feely, CFO at the time, commented, "We have a lot going on in Q4 to close out the year, can we push this off to January?" Thus, dismissing Plaintiff completely in front of Ms. Stueland and her Management Team (executive leadership team);

d.  Plaintiff's team was overloaded with ten major projects (in addition to numerous small projects for our internal stakeholders). Plaintiff became concerned about his team's ability to deliver key results against the OKRs. In October of 2023, he asked his manager, Mr. Stolovitzky, for permission to request from Finance an additional budget of $125K to complete a key research paper. However, Mr. Stolovitzky was very upset with the prospect of spending budget and said the current team should be able to do it without outside help. However, Plaintiff's non-Asian peer, Scott Neuman, was provisioned with the largest budget in the

Research department, in excess of $400,000. While Plaintiff's budget was only $60,000 and his request to increase it was outright denied; and

e.  Mr. Stolovitzky would take a presentation opportunity from Plaintiff despite Ms. Stueland's request that Plaintiff review the project at the Quarterly Business Review ("QBR") on October 19, 2023. Mr. Stolovitzky refused to give Plaintiff time on the agenda to demonstrate what his team was doing and where they needed help. Instead, the Plaintiff's section of QBR consisted of two slides, where were the very last slides on the last day of a two-day agenda. Plaintiff's section received about 5 minutes of discussion. Mr. Stolovitzky spent about 25 minutes presenting the long read sequencing program that had a White male team lead (Scott Neuman). Out of four team leads for the Research department (3 Asians and 1 White), Mr. Neuman was the only one who was not laid-off on October 30, 2023.

158.  Defendant's willful and premeditated conduct, by and through its agents and employees, including without limitation Katherine Stueland, Isaac Ro, Eric Schadt, Gustavo Stolovitzky, and Kevin Feely at Defendant, in treating the Plaintiff in a manner unequal to other non-Asian employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of race in violation of Title VII.

159.  The discriminatory acts of Defendant as described above were intentional and were substantially motivated on the basis of Plaintiff's race.

160.   As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to

incur attorney's fees, expenses, and costs.

**COUNT TEN: RACE DISCRIMINATION UNDER NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXEC. LAW § 296**

161.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 160, as if fully set forth herein.

162.   Throughout his employment with Defendant, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of his race, which is Asian (Japanese ethnicity).

163.   Plaintiff was qualified for his position and was performing in exemplary fashion at the time he was terminated.

164.   Plaintiff was repeatedly treated differently than his similarly situated non-Asian coworkers including but not limited to:

   a.   Defendant has targeted and purged their ranks of Asians. The Research department began 2023 with a majority of Asian employees, about 25 full time employees, of which, about 18 (or >70%) were Asian. The two most recent lay-offs in Q2 2023 and Q3 2023, which included Plaintiff on October 30, 2023, constituted a total of about 12 full time employees comprised of nine Asians (75%);

   b.   Plaintiff experienced disparate treatment in comparison to a non-Asian peer, Scott Neuman (White), who was the only lead within the Research department not to be terminated on October 30, 2023. Plaintiff and the other two leads (both Asian) were terminated;

   c.   During Plaintiff's time at Defendant GeneDx, his access to key people and opportunities was limited or taken from him while he and his team were

overloaded with work in comparison to non-Asian peers. Despite being a member of the senior leadership team ("SLT"), Plaintiff was not given access to meetings with Katherine Stueland, Defendant's CEO. Further, other Asians on the SLT never had an opportunity to speak with Ms. Stueland. In fact, Plaintiff presented to her only once. When Plaintiff proposed conducting an internal lab audit to ensure that Defendant GeneDx could comply with potential future regulations, Kevin Feely, CFO at the time, commented, "We have a lot going on in Q4 to close out the year, can we push this off to January?" Thus, dismissing Plaintiff completely in front of Ms. Stueland and her Management Team (executive leadership team);

d.   Plaintiff's team was overloaded with ten major projects (in addition to numerous small projects for our internal stakeholders). Plaintiff became concerned about his team's ability to deliver key results against the OKRs. In October of 2023, he asked his manager, Mr. Stolovitzky, for permission to request from Finance an additional budget of $125K to complete a key research paper. However, Mr. Stolovitzky was very upset with the prospect of spending budget and said the current team should be able to do it without outside help. However, Plaintiff's non-Asian peer, Scott Neuman, was provisioned with the largest budget in the Research department, in excess of $400,000. While Plaintiff's budget was only $60,000 and his request to increase it was outright denied; and

e.   Mr. Stolovitzky would take a presentation opportunity from Plaintiff despite Ms. Stueland's request that Plaintiff review the project at the Quarterly Business Review ("QBR") on October 19, 2023. Mr. Stolovitzky refused to give Plaintiff

time on the agenda to demonstrate what his team was doing and where they

needed help. Instead, the Plaintiff's section of QBR consisted of two slides, where

were the very last slides on the last day of a two-day agenda.  Plaintiff's section

received about 5 minutes of discussion. Mr. Stolovitzky spent about 25 minutes

presenting the long read sequencing program that had a White male team lead

(Scott Neuman). Out of four team leads for the Research department (3 Asians

and 1 White), Mr. Neuman was the only one who was not laid-off on October 30,

2023.

165.   Defendant's willful and premeditated conduct, by and through its agents and employees,

including without limitation Katherine Stueland, Isaac Ro, Eric Schadt, Gustavo

Stolovitzky, and Kevin Feely at Defendant, in treating the Plaintiff in a manner unequal

to other non-Asian employees as described above, discriminatorily denied Plaintiff equal

treatment on the basis of race in violation of New York State Human Rights Law, N.Y.

Exec. Law § 296.

166.   The discriminatory acts of Defendant as described above were intentional and were

substantially motivated on the basis of Plaintiff's race.

167.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer

damages and losses including, but not limited to, reputational harm, lost wages, lost

employment benefits, emotional distress, and Plaintiff has incurred and will continue to

incur attorney's fees, expenses, and costs.

## COUNT ELEVEN: RACE DISCRIMINATION UNDER NEW YORK CITY HUMAN RIGHTS LAW § 8-107

168.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 167, as if fully set forth herein.

169.   Defendant has unlawfully and willfully discriminated against Plaintiff substantially because of his race as set forth above with regard to the terms, conditions and opportunities of his employment in violation of New York City Human Rights Law § 8-107.

170.   Defendant has unlawfully and willfully engaged in disparate treatment of the Plaintiff in violation of New York City Human Rights Law § 8-107 as it took adverse actions as set forth above against the Plaintiff, who is Asian (Japanese ethnicity), who was qualified for his position and was performing in exemplary fashion at the time he was terminated.

171.   Defendant's willful and premeditated termination decision in this case was pretextual and not legitimate and is the cause of Plaintiff's damages, as described herein, for which the Plaintiff seeks redress.

172.   As a result of the Defendant's unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT TWELVE: RACE DISCRIMINATION UNDER PHCA

173.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 172, as if fully set forth herein.

174.   Plaintiff was at all relevant times a highly qualified and competent employee of Defendant, and a covered person pursuant to the Pennsylvania Human Relations Act

(hereinafter, "PHRA").

175.   Throughout his employment with Defendant, Plaintiff was intentionally subjected to

unequal treatment and to a series of continuous adverse employment actions on account

of his race, which is Asian (Japanese ethnicity).

176.   Plaintiff was repeatedly treated differently than his similarly situated non-Asian

coworkers including but not limited to:

a.   Defendant has targeted and purged their ranks of Asians. The Research

department began 2023 with a majority of Asian employees, about 25 full time

employees, of which, about 18 (or >70%) were Asian. The two most recent lay-

offs in Q2 2023 and Q3 2023, which included Plaintiff on October 30, 2023,

constituted a total of about 12 full time employees comprised of nine Asians

(75%);

b.   Plaintiff experienced disparate treatment in comparison to a non-Asian peer

(White) who was the only lead within the Research department not to be

terminated on October 30, 2023. Plaintiff and the other two leads (both Asian)

were terminated;

c.   During Plaintiff's time at Defendant GeneDx, his access to key people and

opportunities was limited or taken from him while he and his team were

overloaded with work in comparison to non-Asian peers. Despite being a member

of the senior leadership team ("SLT"), Plaintiff was not given access to meetings

with Katherine Stueland, Defendant's CEO. Further, other Asians on the SLT

never had an opportunity to speak with Ms. Stueland. In fact, Plaintiff presented

to her only once. When Plaintiff proposed conducting an internal lab audit to

ensure that Defendant GeneDx could comply with potential future regulations, Kevin Feely, CFO at the time, commented, "We have a lot going on in Q4 to close out the year, can we push this off to January?" Thus, dismissing Plaintiff completely in front of Ms. Stueland and her Management Team (executive leadership team);

d.   Plaintiff's team was overloaded with ten major projects (in addition to numerous small projects for our internal stakeholders). Plaintiff became concerned about his team's ability to deliver key results against the OKRs. In October of 2023, he asked his manager, Mr. Stolovitzky, for permission to request from Finance an additional budget of $125K to complete a key research paper. However, Mr. Stolovitzky was very upset with the prospect of spending budget and said the current team should be able to do it without outside help. However, Plaintiff's non-Asian peer, Scott Neuman, was provisioned with the largest budget in the Research department, in excess of $400,000. While Plaintiff's budget was only $60,000 and his request to increase it was outright denied; and

e.   Mr. Stolovitzky would take a presentation opportunity from Plaintiff despite Ms. Stueland's request that Plaintiff review the project at the Quarterly Business Review ("QBR") on October 19, 2023. Mr. Stolovitzky refused to give Plaintiff time on the agenda to demonstrate what his team was doing and where they needed help. Instead, the Plaintiff's section of QBR consisted of two slides, where were the very last slides on the last day of a two-day agenda.  Plaintiff's section received about 5 minutes of discussion. Mr. Stolovitzky spent about 25 minutes presenting the long read sequencing program that had a White male team lead

(Scott Neuman). Out of four team leads for the Research department (3 Asians and 1 White), Mr. Neuman was the only one who was not laid-off on October 30, 2023.

177.   Defendant's conduct, by and through its agents and employees, including without limitation Katherine Stueland, Isaac Ro, Eric Schadt, Gustavo Stolovitzky, and Kevin Feely, in treating the Plaintiff in a manner unequal to other employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of race in violation of the PHRA.

178.   The discriminatory acts of Defendant as described above were intentional and were substantially motivated on the basis of Plaintiff's race.

179.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT THIRTEEN: RACE DISCRIMINATION UNDER CFEPA**

180.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 179, as if fully set forth herein.

181.   Plaintiff was at all relevant times a highly qualified and competent employee of Defendant, and a covered person pursuant to the Connecticut Fair Employment Practices Act (hereafter, "CFEPA").

182.   Throughout his employment with Defendant, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of his race, which is Asian (Japanese ethnicity).

183.   Plaintiff was repeatedly treated differently than his similarly situated non-Asian

coworkers including but not limited to:

a.   Defendant has targeted and purged their ranks of Asians. The Research

department began 2023 with a majority of Asian employees, about 25 full time

employees, of which, about 18 (or >70%) were Asian. The two most recent lay-

offs in Q2 2023 and Q3 2023, which included Plaintiff on October 30, 2023,

constituted a total of about 12 full time employees comprised of nine Asians

(75%);

b.   Plaintiff experienced disparate treatment in comparison to a non-Asian peer

(White) who was the only lead within the Research department not to be

terminated on October 30, 2023. Plaintiff and the other two leads (both Asian)

were terminated;

c.   During Plaintiff's time at Defendant GeneDx, his access to key people and

opportunities was limited or taken from him while he and his team were

overloaded with work in comparison to non-Asian peers. Despite being a member

of the senior leadership team ("SLT"), Plaintiff was not given access to meetings

with Katherine Stueland, Defendant's CEO. Further, other Asians on the SLT

never had an opportunity to speak with Ms. Stueland. In fact, Plaintiff presented

to her only once. When Plaintiff proposed conducting an internal lab audit to

ensure that Defendant GeneDx could comply with potential future regulations,

Kevin Feely, CFO at the time, commented, "We have a lot going on in Q4 to

close out the year, can we push this off to January?" Thus, dismissing Plaintiff

completely in front of Ms. Stueland and her Management Team (executive

leadership team);

d.   Plaintiff's team was overloaded with ten major projects (in addition to numerous small projects for our internal stakeholders). Plaintiff became concerned about his team's ability to deliver key results against the OKRs. In October of 2023, he asked his manager, Mr. Stolovitzky, for permission to request from Finance an additional budget of $125K to complete a key research paper. However, Mr. Stolovitzky was very upset with the prospect of spending budget and said the current team should be able to do it without outside help. However, Plaintiff's non-Asian peer, Scott Neuman, was provisioned with the largest budget in the Research department, in excess of $400,000. While Plaintiff's budget was only $60,000 and his request to increase it was outright denied; and

e.   Mr. Stolovitzky would take a presentation opportunity from Plaintiff despite Ms. Stueland's request that Plaintiff review the project at the Quarterly Business Review ("QBR") on October 19, 2023. Mr. Stolovitzky refused to give Plaintiff time on the agenda to demonstrate what his team was doing and where they needed help. Instead, the Plaintiff's section of QBR consisted of two slides, where were the very last slides on the last day of a two-day agenda. Plaintiff's section received about 5 minutes of discussion. Mr. Stolovitzky spent about 25 minutes presenting the long read sequencing program that had a White male team lead (Scott Neuman). Out of four team leads for the Research department (3 Asians and 1 White), Mr. Neuman was the only one who was not laid-off on October 30, 2023.

184.   Defendant's conduct, by and through its agents and employees, including without

limitation Katherine Stueland, Isaac Ro, Eric Schadt, Gustavo Stolovitzky, and Kevin Feely, in treating the Plaintiff in a manner unequal to other employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of race in violation of the CFEPA.

185.   The discriminatory acts of Defendant as described above were intentional and were substantially motivated on the basis of Plaintiff's race.

186.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT FOURTEEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

187.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 186, as if fully set forth herein.

188.   The actions of Defendant as set forth above, including the acts of discrimination including without limitation:

   a.   Defendant has targeted and purged their ranks of Asians. The Research department began 2023 with a majority of Asian employees, about 25 full time employees, of which, about 18 (or >70%) were Asian. The two most recent lay-offs in Q2 2023 and Q3 2023, which included Plaintiff on October 30, 2023, constituted a total of about 12 full time employees comprised of nine Asians (75%);

   b.   Plaintiff experienced disparate treatment in comparison to a non-Asian peer (White) who was the only lead within the Research department not to be

terminated on October 30, 2023. Plaintiff and the other two leads (both Asian) were terminated;

c.  During Plaintiff's time at Defendant GeneDx, his access to key people and opportunities was limited or taken from him while he and his team were overloaded with work in comparison to non-Asian peers. Despite being a member of the senior leadership team ("SLT"), Plaintiff was not given access to meetings with Katherine Stueland, Defendant's CEO. Further, other Asians on the SLT never had an opportunity to speak with Ms. Stueland. In fact, Plaintiff presented to her only once. When Plaintiff proposed conducting an internal lab audit to ensure that Defendant GeneDx could comply with potential future regulations, Kevin Feely, CFO at the time, commented, "We have a lot going on in Q4 to close out the year, can we push this off to January?" Thus, dismissing Plaintiff completely in front of Ms. Stueland and her Management Team (executive leadership team);

d.  Plaintiff's team was overloaded with ten major projects (in addition to numerous small projects for our internal stakeholders). Plaintiff became concerned about his team's ability to deliver key results against the OKRs. In October of 2023, he asked his manager, Mr. Stolovitzky, for permission to request from Finance an additional budget of $125K to complete a key research paper. However, Mr. Stolovitzky was very upset with the prospect of spending budget and said the current team should be able to do it without outside help. However, Plaintiff's non-Asian peer, Scott Neuman, was provisioned with the largest budget in the Research department, in excess of $400,000. While Plaintiff's budget was only

$60,000 and his request to increase it was outright denied; and

 e. Mr. Stolovitzky would take a presentation opportunity from Plaintiff despite Ms. Stueland's request that Plaintiff review the project at the Quarterly Business Review ("QBR") on October 19, 2023. Mr. Stolovitzky refused to give Plaintiff time on the agenda to demonstrate what his team was doing and where they needed help. Instead, the Plaintiff's section of QBR consisted of two slides, where were the very last slides on the last day of a two-day agenda. Plaintiff's section received about 5 minutes of discussion. Mr. Stolovitzky spent about 25 minutes presenting the long read sequencing program that had a White male team lead (Scott Neuman). Out of four team leads for the Research department (3 Asians and 1 White), Mr. Neuman was the only one who was not laid-off on October 30, 2023.

189. In taking the actions against Plaintiff as aforesaid, Defendant intended to inflict emotional distress or it knew or should have known that emotional distress was the likely result of its conduct.

190. The conduct of Defendant in this case was extreme and outrageous and was the cause of Plaintiff's distress.

191. The emotional distress sustained by Plaintiff was severe.

192. As a direct result of Defendant's intentional actions, Plaintiff suffered emotional distress and significant hypertension due to elevated stress and anxiety created by Defendant's toxic work environment. He also developed insomnia caused by his treatment by Defendant GeneDx. Plaintiff also fears not finding comparable employment due Defendant's illegal business practices. Further, he is extremely concerned about the

lasting damage to his name and reputation, which he worked so hard to build and maintain over the years. He also fears being retaliated for speaking out by former and current executives at Defendant that may seek to secretly undermine his work reputation as the Defendant's actions have heighted his fear and anxiety that Defendant was a retaliatory company, all to his loss and damage.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

(a) Award compensatory damages;

(b) Award punitive damages;

(c) Award attorneys' fees and costs;

(d) Award pre-judgement interest;

(e) Award post-judgement interest; and

(f) Award such other relief in law or equity as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all questions of fact raised by his Complaint.

Respectfully submitted,

PLAINTIFF
MITCHELL HIGASHI

By:   /s/
    Mark P. Carey (ct17828)
    Genevieve M. Lage (ct30334)
    Carey & Associates, P.C.
    71 Old Post Road, Suite 1
    Southport, CT 06890
    (203) 255-4150 tel.
    (203) 255-0380 fax
    mcarey@capclaw.com
    glage@capclaw.com
    *His Attorneys*

# **EXHIBIT A**



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Boston Area Office**
15 New Dudbury St, Room 475
Boston, MA 02203
(617) 865-3670
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 02/12/2024

**To:** Mitchell Higashi
682 Conestoga Road
Villanova, PA 19085
Charge No: 523-2024-00782

EEOC Representative and email:    FENG AN
Area Director
Feng.An@EEOC.GOV

---

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 523-2024-00782.

On behalf of the Commission,

Digitally Signed By:Feng K. An
02/12/2024

Feng K. An
Area Office Director

**Cc:**
Caroline Park
CPark@wiggin.com

Genevieve Lage
Carey & Associates, P.C
71 Old Post Road
Southport, CT 06890


Please retain this notice for your records.

# **<u>EXHIBIT B</u>**



**STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**

<u>**Mitchell Higashi**</u>
COMPLAINANT

CHRO No. 2420211

vs.

EEOC No. 523-2024-00782

<u>**GeneDx Holdings Corp.**</u>
RESPONDENT

## <u>RELEASE OF JURISDICTION</u>

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

<u>The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.</u>

**DATE: 4/19/2024**

*Tanya A. Hughes*
Tanya A. Hughes, Executive Director

Service:
Complainant:                    Mitchell Higashi, via Email: c/o Mark Carey, Esq., mcarey@capclaw.com
Complainant's Attorney:    Mark Carey, Esq., via Email: mcarey@capclaw.com
Complainant's Attorney:    Genevieve M. Lage, Esq., via Email: glage@capclaw.com
Respondent's Contact:      Devin K. Schaffer, Esq., via Email: dschaffer@genedx.com
Respondent's Attorney:     Caroline Park, Esq., via Email: cpark@wiggin.com

# **EXHIBIT C**



Date: February 21, 2024

Mitchell Higashi
682 Conestoga Rd.
Villanova, PA 19085

Re:    Mitchell Higashi vs. GeneDX Holdings Corp.
PHRC Case No. 202316272

## INTAKE CASE CLOSURE NOTIFICATION

Dear Mr. Higashi,

The Pennsylvania Human Relations Commission ("PHRC") reviewed the above referenced Complaint and considers this case closed as of the date of this letter for the following selected reason:

[  ]   Complainant failed to cooperate during intake

[ x ] **Complaint is a duplicate of: 202314528**

[  ]   Unable to Locate [COMPLAINANT/RESPONDENT]

[  ]   Complaint was withdrawn prior to docketing

[ ]   Complainant failed to pursue case

[  ]   The PHRC lacks jurisdiction. This is also not jurisdictional for EEOC or HUD.

[  ]   The complaint was untimely filed. It is also untimely filed for EEOC or HUD.

Since the case will not be investigated, no complaint will be served upon the named Respondent.

The Pennsylvania Human Relations Act affords both the Complainant and the Respondent the opportunity to comment after the final disposition of the Complaint. If you wish to make written comments regarding the investigation of the Complaint, you must send them to Pennsylvania Human Relations Commissioners
c/o Director of Enforcement; 333 Market Street 8th Floor Harrisburg, PA 17101.

Sincerely:

Chad Dion Lassiter, MSW
Executive Director
Pennsylvania Human Relations Commission

cc:

## PENNSYLVANIA HUMAN RELATIONS COMMISSION

## NOTICE OF COMPLAINANT'S RIGHTS

The complainant has the right to request a preliminary hearing in this matter, pursuant to the PHRC's Special Rules of Administrative Practice and Procedure, 16 Pa. Code § 42.62. Should the complainant desire to file such a request, it must be in writing, and it must state specifically the grounds upon which the complainant disputes the PHRC's closure. It may contain new evidence not previously considered. If the Request for a Preliminary Hearing is based upon new or previously unconsidered evidence, the nature, location, and form of the evidence in issue must be explicitly set forth in the request.

The purpose of the hearing, should the PHRC grant one, will be to decide whether the PHRC has properly closed the complaint. The PHRC may also decide to reopen the complaint for further investigation instead of conducting a hearing.

Should the complainant desire to file a Request for a Preliminary Hearing, it <u>must be received</u> by PHRC within ten days of the receipt of this notice to be entitled to these rights. The filing must be identified as a "Request for Preliminary Hearing" and be addressed to:

**Office of Appeals**
**Pennsylvania Human Relations Commission**
**333 Market St., 8th Floor**
**Harrisburg, PA 17101**

If the Complainant files a Request for a Preliminary Hearing with the PHRC, he/she will be notified as to whether a preliminary hearing has been granted. Should the PHRC grant a preliminary hearing, you will be provided with more information about the hearing. At any time, the Complainant may withdraw his/her request.

In addition, you are hereby notified, as required by Section 12(c) of the Pennsylvania Human Relations Act, 43 P.S. Section 962(c), that the complainant has the right, upon closure of the case, to file a complaint in the Court of Common Pleas of the county in which the alleged unlawful discriminatory practice took place. The complainant may retain a private attorney regarding this matter or about any other rights he/she may have in this matter.

**Complainants who file a complaint in the Court of Common Pleas are required by Section 12(c)(2) of the Pennsylvania Human Relations Act to serve the PHRC with a copy of the Court complaint. This copy must be served on the PHRC at the same time the complainant files it in Court. The copy is to be sent to:**

**Enforcement Division**
**Pennsylvania Human Relations Commission**
**333 Market St., 8th Floor**
**Harrisburg, PA 17101**